IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No: 21-CR-28 (APM) |
| | : | |
| JOSHUA JAMES, | : | |
| *Defendant* | : | |

## MOTION FOR REVOCATION OF DETENTION ORDER PURSUANT TO 18 USC § 3145 (B)

COMES NOW the accused, Joshua James, by counsel, and respectfully moves this Honorable Court to review the Order of Detention entered on March 11, 2021 by the United States Magistrate Court in Alabama, and to release Mr. James on conditions that are satisfactory to the Court.  At the outset, it should be noted that none of the charges against Mr. James triggers the rebuttable presumption against bond. *See* 18 U.S.C. § 3142(e)(3)(C). Unlike ten of the other eleven defendants on the indictment, Mr. James is not accused or charged with destruction of government property, in violation of 18 U.S.C. § 1361.[1]  This fact is significant because the Government has taken the position in prior pleadings[2] that a felony destruction of property offense triggers a rebuttable presumption of detention and because the charge of felony destruction of property — *unlike any of the charges Mr. James faces* — arguably entitles the Government to a detention hearing under § 3142(f)(2).

---

[1] The eleventh defendant, Roberto Minuta, was similarly not charged with destruction of government property. Mr. Minuta, who faces the same three charges that Mr. James does, was granted release on March 8, 2021.

[2] *See, e.g.* Government's Supplemental Memorandum in Support of Pretrial Detention by USA as to Jessica Marie Watkins (docket entry 42).

To be clear, Mr. James was not among the individuals who vandalized windows, doors and other property at the United States Capitol or rifled through legislators desks on January 6, 2021. Nor was he was among the "stack" of organized individuals who formed a human chain outside the Capitol and whom the Government has alleged forced their way into the Capitol. Nor did he cause injury to anyone or assault anyone[3] — facts all conceded under oath by the federal agent who testified at Mr James' preliminary hearing.  In contrast to the other defendants, Mr. James enjoys a presumption in favor of release and should never have been subject to a detention hearing.

## BACKGROUND

On March 8, 2021, the Government filed a Criminal Complaint under seal charging Mr. James with obstructing or impeding an official proceeding, in violation of 18 U.S.C. § 1512 (c)(2), 2, and with a misdemeanor charge of entering a restricted building or grounds, in violation of 18 U.S.C. 1752(a)(1) and (2).  A sealed arrest warrant issued the same day. The affidavit in support of the criminal complaint generally alleged that Mr. James, while wearing items of clothing decorated with the Oath keepers patch, unlawfully entered the United States Capitol on January 6, 2021, thereby disrupting a Joint Session of the United States House of Representatives and the United States Senate convened in the Capitol building to certify the Electoral College vote of the Presidential Election.  The affidavit further alleged that Mr. James was in contact with and was in the presence of other Oath Keepers before and after he allegedly unlawfully entered the Capitol.  Notably absent from the affidavit was any allegation that Mr. James engaged in acts of violence, or threatening behavior, or intimidating behavior.

---

[3] Tr. 9-10, 35, 38

On the morning of March 9, 2021 — one day after his sealed criminal complaint and arrest warrant were filed — Mr. James was arrested shortly after he left his home in Alabama (a home he shares with his wife and their three children) and drove to work. At his Rule 5 hearing later that same day, Mr. James waved his right to an identity hearing. The Government moved for detention and a detention hearing and preliminary hearing were scheduled for March 11, 2021.

On March 11, 2021, a preliminary hearing and detention hearing were conducted before Magistrate Judge Gray M. Borden in the Northern District of Alabama. The Government argued that detention was appropriate under 18 U.S.C. 3142(f)(2(B). That section provides in relevant part:

> **(f) Detention hearing.** The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of the person as required and the safety of any other person and the community—
>
>> **(2)** upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves—
>>
>>> **(B)** a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

At the conclusion of the hearing, the court ruled that Mr. James did not pose a flight risk — a fact conceded by the Government at the start of the hearing — but that he did pose a risk to the safety of the community due to Mr. James' history of PTSD, coupled with his access to lawfully owned firearms. Magistrate Borden also referenced the nature of the offense, strength of the evidence, and association with the Oath Keepers as factors supporting his conclusion. (Tr.

71-72).[4]  The court did not make a finding that Mr. James posed a serious risk of obstructing or attempting to obstruct justice, nor did it find that Mr. James posed a risk of threatening, injuring or intimidating a prospective witness or juror.

On March 31, 2021, the Government filed a third superseding indictment in the Criminal Case No. 1:21CR28.  The indictment added defendants James and Minuta.  Mr. James and Mr. Minuta are each charged with one count of conspiracy in violation of 18 U.S.C. § 371, one count of obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. § 1512(c)(2), 2, and entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1).   Mr. Minuta was ordered released on March 8, 2021.   Mr. James has been in custody in Alabama since his arrest on March 9, 2021.  He now files this motion for revocation of the Magistrate Judge's detention order, pursuant to 18 U.S.C. § 3145(b).

## II. Legal Standard

If a federal defendant is ordered detained by a U.S. Magistrate Judge, the defendant may seek review of that release order by filing, with the Court having original jurisdiction over the offense, a motion to revoke the order or amend the conditions of release.  *See* 18 U.S.C. § 3145(b).  The statute concerning review of a magistrate judge's release order does not address the standard of the district court's review and this Circuit has not squarely decided the issue.  *See United States v. Munchel*, Nos. 21-3010, 21-3011, 2021 U.S. App. LEXIS 8810, at *14 (D.C. Cir. Mar. 26, 2021).  However, every circuit that has considered the issue has concluded that a district court should review a magistrate judge's release or detention order *de novo*.  *See United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 U.S. Dist. LEXIS 36117, note 5 (D.D.C. Feb. 26, 2021)

---

[4] Because counsel has quoted and summarized from the March 11, 2021 hearing in Magistrate Court, counsel has attached the complete transcript of that proceeding.

(providing a breakdown of the circuits that have addressed the issue).  Multiple decisions from this Court have reached the same conclusion.  *See, e.g., United States v. Johnston*, No. 17-MJ-0046 (BAH), 2017 U.S. Dist. LEXIS 159461, at *8 (D.D.C. Sep. 28, 2017); *United States v. Hudspeth*, 143 F. Supp. 2d 32, 36 (D. D.C. 2001); *United States v. Weissberger*, 951 F.2d 392, 395 (D.C. Cir. 1991).

### III.  Legal Argument

Our criminal justice system embraces a strong presumption against detention.  *United States v. Ali Muhamed Ali*, 793 F. Supp. 2d 386, 387 (D.D.C. 2011).  "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Gloster*, 969 F. Supp. 92, 96-97 (D.D.C. 1997) (*quoting United States v. Salerno*, 481 U.S. 739, 755 (1987)).

#### A.  DETENTION IS NOT AUTHORIZED UNDER THE BAIL REFORM ACT FOR THE CHARGED OFFENSES IN THE INSTANT CASE

In *United State v. Salerno*, 481 U.S. 739 (1987), The Supreme Court recognized that The Bail Reform Act limits pretrial detention of persons who are presumed innocent to a small subset of defendants charged with crimes that are "the most serious" compared to other federal offenses.  *Id*. at 747.

> Detention until trial is relatively difficult to impose. First, a judicial officer must find one of six circumstances [enumerated in 18 U.S.C. § 3142(f)] triggering a detention hearing. ... Absent one of these circumstances, detention is not an option. *See, e.g., United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988). Second, assuming a hearing is appropriate, the judicial officer must consider several enumerated factors to determine whether conditions short of detention will "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g).

*United States v. Singleton*, 337 U.S. App. D.C. 96, 182 F.3d 7, 9 (1999); *see United States v. Salerno*, 481 U.S. 739, 750 (1987) ("The [Bail Reform] Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. 18 U. S. C. § 3142(f). Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest.").

For a court to detain a defendant pending trial, one of six (6) factors enumerated in 18 U.S.C. §§ 3142(f)(1) and (2) must be satisfied.

### i) Mr. James's Charges Do Not Involve a Crime Specified in 18 U.S.C. § 3142(f)(1)

Section 3142(f)(1) describes a class of cases that permits pretrial detention including crimes of violence; sexual abuse cases; offenses where the maximum sentence is life or death; serious drug felonies; where the defendant is a serious recidivist; offenses involving child victims; and offenses listed in 18 U.S.C. 2332b(g)(5)(B) with a maximum sentence of ten years or more.  None of the charges against Mr. James involves a crime specified in 18 U.S.C. § 3142(f)(1).  In this respect, Mr. James' case is distinguishable from each of the earlier defendants on the indictment who have sought bond review before this Court.

### ii) Mr. James's Case Does Not Involve a Risk Factor Specified in 18 U.S.C. § 3142(f)(2)

The Government may also seek detention pursuant to 18 U.S.C. § 3142(f)(2) if: (1) there is a serious risk the person will flee; or (2) there is a serious risk that the person will "obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2).  In Mr. James's case, the magistrate judge found that he did *not* pose a flight risk (Tr. 69) and the Government candidly conceded this fact on the record (Tr. 4).  There is overwhelming evidence to support this.

Retired Specialist Joshua Adam James honorably served our country in the United States Army for four years before medically retiring. His service to our country included a tour in Iraq where, prior to his 20th birthday, he sustained life threatening injuries in a series of bombings. He was airlifted to a medical facility and eventually had to undergo multiple reconstructive facial surgeries. He is a Purple Heart Recipient and receives disability.

Now 33 years old, Mr. James and his wife have three children[5], the youngest of whom is just three years old. Mr. James and his family live in Alabama. As repeatedly documented in the nearly 20 letters in support of his release, Mr. James and his wife are both actively involved and well respected members of their community. Mr. James's involvement in his community ranges from tasks as simple as helping neighbors with car problems,[6] to his involvement in his children's school and sports activities,[7] to volunteering his time to assist hurricane damaged communities.[8] Even after January 6, 2021, Mr. James continued to volunteer his time and provide disaster relief efforts by driving a truck full of supplies (diapers, water filtration, paper towels, food and clothing) to Fultondale, Alabama in the aftermath of a tornado and by serving as an overnight security guard to an impacted business to prevent theft and looting.[9] While engaging in these efforts, he was in contact with local law enforcement to advise them of his willingness to be of service.

---

[5] Two of their children are from Mrs. James's first marriage; the youngest child is from Mr. and Mrs. James's union.

[6] *See* A. Terrell letter.

[7] S*ee, e.g.* J. Shipp and J.B. Cullman letters.

[8] S*ee, e.g.* M. James, J. Poirier, and R. Levy letters.

[9] For an account of the tornado, *see* Errol Barnet, "Deadly tornado leaves path of destruction in Alabama," CBS News, Jan. 26, 2021, available at https://www.cbsnews.com/news/alabama-tornado-fultondale-casualties. (last viewed April 6, 2021).

For the past three years, Mr. James has owned and operated his own successful small business, providing power washing and gutter cleaning services to commercial and residential clients. His company, American Pro Hydro Services, has a five star, 100% recommended rating on homeadvisor.com. Among the 79 positive reviews, customers commented: "did a fantastic job, was here when he said he would be, always replied to answer my questions"; "Joshua made sure everything was right with me before he left. Always on time"; "they were very personable, showed up on time and the work they did was outstanding"; "Josh called to let me know he was running a little late but showed at the time he told me. He went straight to work cleaning the cement steps of leaves… After he finished he made sure I was happy with his work. … He does what he says he will do and provides excellent work"; "Joshua was very personable, knowledgeable, and did an excellent job cleaning our gutters and roof… as military retirees with 55 years total service, we are very pleased to be using the services of a fellow veteran!"; "Joshua and his helper were on time, a little early, in fact, called before coming, did a super job, were very courteous, cleaned up anything that needed cleaning up, will hire them again"; "The owner operator worked very hard and did an amazing job. His knowledge and professionalism is a credit to the younger professionals today. I will use them again and would recommend them to anyone needing these services. He is also a veteran and I appreciated the work he did for our country and for my home."[10]

Just as Mr. James does not pose a flight risk, neither does he pose a risk of obstructing or attempting to obstruct justice, or of threatening, injuring or intimidating a prospective witness or juror. *See* 18 U.S.C. § 3142(f)(2). First and foremost, there is no evidence that Mr. James threatened, injured or intimidated anyone before, during or after the events of January 6, 2021.

---

[10] *See* Home Advisor reviews

Moreover, in light of the fact that agents made no effort to arrest him until three months later, he had ample opportunity to engage in such efforts had that been his intention. Finally, unlike some of other defendants,[11] there is no indication that Mr. James engaged in efforts to destroy evidence. When law enforcement conducted a search of his home, they seized multiple Oath Keeper related items. Finally, Mr. James's forthright interview with Pretrial Services in Alabama, where he voluntarily disclosed sensitive personal information that was not otherwise known, further demonstrates his candor and supports the conclusion that he does not pose a risk of engaging in obstructive tactics.

### B. HAD THE GOVERNMENT BEEN ENTITLED TO SEEK DETENTION ON THESE CHARGES UNDER § 3142(F), DETENTION WOULD STILL HAVE BEEN INAPPROPRIATE BECAUSE CONDITIONS SHORT OF DETENTION WILL "REASONABLY ASSURE THE SAFETY OF ANY OTHER PERSON AND THE COMMUNITY."

In cases where a detention hearing is authorized under 18 U.S.C. § 3142(f), the Court must then determine whether "any condition or combination of conditions …will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id*. As discussed above, the magistrate judge determined that Mr. James posed no risk of flight, but instead a danger to the community.

> In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)-(4). To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id*. § 3142(f). Thus, a defendant's detention based on dangerousness accords with due

---

[11] *See, e.g.* Government's Supplemental Opposition to Defendants' Kelly Meggs and Connie Meggs Renewed Requests for Pretrial Release (docket entry 106) (alleging destruction of physical evidence).

process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

*United States v. Munchel*, Nos. 21-3010, 21-3011, 2021 U.S. App. LEXIS 8810, at *12-13 (D.C. Cir. Mar. 26, 2021). The threat posed must be clearly identified and considered in context. *Id.* at *20. Finally, whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant.

### i) Nature and Circumstances of the Offense Charged and Strength of the Evidence

Mr. James is charged with two felony offenses (obstruction of an official proceeding and conspiracy) and one misdemeanor (entering and remaining in a restricted building and grounds). None of his charges are crimes of violence and none of the elements require proof of force. At the preliminary and detention hearing, the Government conceded and a federal agent testified that there was no evidence of Mr. James hitting or assaulting anybody. (Tr. 9-10). To the contrary, Mr. James came to the aid of at least one law enforcement member on January 6. Nor did Mr. James participate in the "stack" of individuals (depicted in photographs on p. 6 of the affidavit), whom the Government alleges forcefully entered the Capitol at 2:40pm. In contrast, Mr. James is not alleged to have entered the building until 3:15 p.m. and the indictment suggests that he exited mere minutes later.

Although the hyperbolic language in the affidavit and indictment allege that Mr. James "forcefully stormed" the Capitol, that allegation is devoid of supporting evidence. In fact, none of the photographic evidence in the affidavit supports that claim. To the contrary, each of the photographs of Mr. James show him either standing still or casually walking with his arms down by his sides. Tellingly, in one of the photographs (affidavit p.15). that the Government labeled

"in a Capitol hallway," Mr. James appears to be standing next to a police officer whose hands are down by his sides and who appears to be making no effort to prevent individuals from coming or going. This is in contrast to an allegation contained in the Indictment that Mr. James "pushed past U.S. Capitol Police" — an allegation that is missing from the affidavit and inconsistent with the sworn testimony of the federal agent who testified at Mr. James's preliminary and detention hearing. In comparison to Mr. James's conduct, Mr. Minuta — who was granted release — videotaped himself taunting police and was photographed "stepping toward and waiving his arms at law enforcement officer in riot gear guarding the building." Affidavit ¶36.

With respect to the conspiracy count against Mr. James, the indictment details various phone calls that Mr. James placed or received to alleged Oath keeper affiliates leading up to and during the events of January 6, but it fails to provide any information whatsoever regarding the content of those phone calls. Importantly, Mr. James was present in Washington, D.C. on the 5th and the 6th to provide security detail for high profile speakers and lawful participants in the events. There is nothing illegal about providing personal security detail. The agent who testified at the preliminary and detention hearing acknowledged as much. (Tr. 40) The fact that Mr. James was in contact with other alleged Oath keeper affiliates (who were also providing or assisting with security detail) is neither surprising nor criminal. Additionally, a quick search of the Signal chats referenced by the Government in the indictment reveals that much of the content that allegedly involves Mr. James is related to providing personal security detail teams ("PSD") to protect speakers and other high profile demonstrators exercising their First Amendment rights. Upon information and belief, Mr. James was not a party to any of the Zello application chats on the "Stop the Steal" channel referenced in the charging documents.

**ii) Strength of the Evidence**

Assuming, without conceding, that the evidence is sufficient to place Mr. James inside the Capitol, that does not amount to proof that he obstructed or conspired to obstruct an official proceeding. This is particularly true in light of the fact that Mr. James is not alleged to have entered the building until 3:15 p.m., roughly 35-40 minutes after the building was breached, and it is suggested that he exited mere minutes later. Moreover, none of his communications reveal an intention on his part to interfere with the Joint Session's certification of the electoral college vote. To the contrary, his communications and his intentions were focused on providing security detail for speakers and demonstrators at the events.

**iii) Personal History and Characteristics**

Retired Specialist Joshua James is a beloved husband, father, valued member of his community, successful small business owner, Army combat veteran and Purple Heart recipient. He is 33 years old and has no prior criminal convictions. Those who know him best describe him in their letters to this Court as honorable, trustworthy, hardworking, and never hesitant to lend a hand to those in need.[12] His service to his community is documented time and again throughout the letters provided to the Court, perhaps most notably in those letters that discuss his disaster relief volunteer efforts. The same admirable traits that his friends and family speak to in their letters to the Court are also evident among the dozens of positive online reviews written by customers of his small business. In the words of his wife, Audrey James, "[h]e is our Veteran, chef, provider and our protector." In sum, he is a man this Court can count on to comply with any and all conditions of release.

---

[12] *See* letters from family and friends in support of release.

**iv) Nature and Seriousness of the Danger to Any Person or The Community that Would Be Posed By the Person's Release.**

In his interview with Pretrial Services in Alabama, Mr. James candidly discussed his prior PTSD diagnosis, which in the past has caused him to experience symptoms of anxiety and depression. He disclosed that on two prior occasions years ago, he voluntarily sought treatment and stayed overnight at a V.A. facility when he was feeling distraught. In the report, those admissions are somewhat misleadingly characterized as hospitalizations. At the detention hearing, neither the Government nor the defense addressed this information in their argument and the magistrate court made no inquiries about it. Nevertheless, the court focused in large part on this piece of information, coupled with Mr. James's lawful ownership of firearms, to support its conclusion of dangerousness. The court did this despite the fact that Mr. James has no history of violent behavior and no history of mishandling firearms. Moreover, on this important point the court seemingly failed to consider the sworn testimony of Mr. James's wife that she would remove the firearms from the home "in a heartbeat" if the court were to order that as a condition of Mr. James's release. (Tr. 53) True to her word, Ms. James has proactively had all firearms removed from the home and placed into a storage facility. There are two sets of keys to the storage space, both of which she gave to a trusted friend. Her friend, Mr. Scheffeld, has agreed to make one set of keys available to Pretrial Services so that they may inspect the storage space at will. Both Mrs. James and Mr. Scheffeld have signed notarized affidavits advising the Court of the same.[13]

Finally, with respect to Mr. James's prior PTSD diagnosis, he will gladly abide by any mental heath conditions imposed by the Court and he has already arranged to have an intake

---

[13] *See* Exhibit "affidavits regarding removal of firearms"

appointment for a mental health evaluation at a V.A. facility near his home in Alabama. The appointment, which undersigned counsel has confirmed, is scheduled for Tuesday, April 13, 2021 at 10:00 a.m.

## IV. Conclusion

For all of the foregoing reasons, and for any additional reasons that may be cited at a hearing on the matter, Mr. James respectfully moves this Court to revoke the Magistrate Judge's detention order.

Respectfully submitted,

_____/s/_____
Joan C. Robin
Virginia Bar No. 44502
Pro Hac Vice Application Pending
Law Office of Joni C. Robin, PLLC
114 North Alfred Street
Alexandria, Virginia 22314
Ph: 703-349-1111
Fax: 571-279-6851
joni@jonirobinlaw.com

_____/s/_____
Christopher Leibig, Esq.
Virginia Bar No. 40594
Counsel for Defendant
114 N. Alfred Street
Alexandria, Virginia 22314
(703) 683 4310
chris@chrisleibiglaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 6th day of April, 2021, I will electronically file the foregoing Notice with the Clerk of Court using the CM/ECF system, which will then send a notification of said filing (NEF) to counsel of record.

                                      _____/s/_____
                                             Joan Robin