**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | ) | | |
| | ) | | |
| **v.** | ) | **No.** | **1:21-cr-28-12 (APM)** |
| | ) | | |
| **JOSHUA JAMES,** | ) | | |
| | ) | | |
| **Defendant.** | ) | | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER**

The United States respectfully files this memorandum in opposition to Defendant Joshua James's request for pretrial release. The defendant planned and coordinated with his co-conspirators to stop the certification of the Electoral College vote, and to be prepared to use violence or rely on other armed individuals the defendant and others believed would be staged nearby. On January 6, he and others stormed the Capitol building and obstructed the ongoing proceeding. And, in the days after January 6, he appears to have deleted evidence and instructed others to do the same. For these reasons, the Court should maintain the order that the defendant be detained pending trial.

## I.    Background

On January 6, 2021, the defendant donned a uniform of military-style equipment and Oath Keepers patches and swerved around law enforcement barricades in a golf cart to race to the Capitol building where a mob was storming inside. The defendant shouted directions while his driver and codefendant made it clear what they were doing: "Patriots storming the Capitol building … word is they got in the building … let's go." When he arrived, the defendant pushed past law enforcement officers attempting to stop him from entering the building and stormed inside. Critically, he did not do so alone. The defendant discussed "op" details with other charged and

1

uncharged individuals in the weeks beforehand, gathered with some of these same individuals and others on the day of January 6, and communicated with them afterward.  In fact, the defendant held himself out as a "leader" of this group—at times using the call sign "HYDRO AL State POC [Point of Contact]"[1]—and the other members treated him as such.  And he used that role to instruct his men to "keep quiet until further notice."

To the defendant, January 6 was a day to win.  On the morning of January 7, 2021, an individual wrote in a Signal chat, "NG [National Guard] has cordoned off the Capital grounds and no foot traffic allowed.  40 Virginia State police cars lined up … No signs or flags supporting Trump visible anywhere.  All quiet."  The defendant responded, "Trump conceded…it's over.  We lose."

Based on his actions described above, on March 9, 2021, the defendant was arrested on a complaint charging him with obstructing an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2 (a felony); and entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor).  The defendant made his initial appearance in the Northern District of Alabama the same day and was detained pending a detention hearing pursuant to 18 U.S.C. § 3142(f).

On March 11, 2021, United States Magistrate Judge Gray M. Borden of the Northern District of Alabama conducted a preliminary hearing and detention hearing, after which he concluded there was probable cause the defendant had committed the charged offenses and ordered that he be detained pending trial.  Judge Borden added, in part:

> You know, regardless of whether I buy the argument that you could join a mob of people at the Capitol and then insulate yourself from what that mob did, it's clear to me that you intentionally joined in a violent uprising against our government.

---

[1] As detailed in the defendant's motion and in the complaint affidavit, the defendant owns and operates his own business called, "American Pro *Hydro* Services," located in Alabama.  Def. Mtn. at 8 (emphasis added); Case 21-cr-28-12-APM (D.D.C.), ECF 1 at 8–9.

And I'm even more concerned about your associated with this Oath Keepers group that we've heard about.

It's clear to me that you're not someone who was simply caught up in the excitement on January 6th.  We've seen or heard about phone records that I think makes it clear that you were involved in planning some of this operation, and certainly your continued communications on the back end show me that there's no remorse there, and there's no recognition of the lasting damage that was on January 6th.

I really think, Mr. James that you knew exactly what you were getting into, but maybe your intent is a little beside the point.  The point is for me that your conduct on and around January 6th, . . . and your access to firearms, all of that leads me to conclude that there are no appropriate conditions of release here.

Case 2:21-mj-67-GMB (N.D. Al.), ECF 9.

On March 31, 2021, a federal grand jury in Washington, D.C., indicted the defendant, adding him to a superseding indictment including eleven co-defendants.  The indictment charges the defendant with conspiracy, in violation of 18 U.S.C. § 371 (a felony); obstructing an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2 (a felony); and entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor).

On April 6, 2021, the defendant filed the instant request for bond review.

## II.   **Legal Standard**

The defendant's motion seeks "revocation" of Magistrate Judge Borden's detention order, pursuant to 18 U.S.C. § 3145(b).  Def.'s Mtn. at 4.  "Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file 'a motion for revocation or amendment to the order' with 'a court having original jurisdiction over the offense.'"  *United States v. Cua*, No. 21-CR-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (citing 18 U.S.C. § 3145(b)).  "Neither § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and the 'D.C. Circuit has not yet

addressed the issue.'" *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *5 (D.D.C. Feb. 26, 2021) (quoting *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017)). "Nonetheless, both the [Bail Reform Act] and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*." *Id* (citing cases); *see also Cua*, 2021 WL 918225, at *3.

Under the Bail Reform Act, the Court must first determine whether one of six circumstances exists, "triggering a detention hearing." *United States v. Singleton*, 182 F.2d 7, 9 (D.C Cir. 1999) (citing 18 U.S.C. § 3142(f)). Here, the government relies on 18 U.S.C. § 3142(f)(2)(B), which provides, in relevant part:

> The judicial officer shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community—upon motion of the attorney for the Government or upon the judicial officer's own motion in a case, that involves a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

Upon holding a detention hearing, the Court "shall order" a defendant detained if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Here, there are no conditions that could assure the latter; in other words, releasing the defendant would present a "danger to the community." *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

"When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," the United States Supreme Court has explained, "a court may disable the arrestee from executing that threat." *United States*

*v. Salerno*, 481 U.S. 739, 751 (1987).  Notably, "the threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'"  *United States v. Munchel*, No. 21-3010, 2021 WL 1149196, at *7 (D.C. Cir. Mar. 26, 2021) (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).  "In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the person,' (3) 'the history and characteristics of the person,' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the persons' release.'"  *Id*. at *4 (quoting 18 U.S.C. § 3142(g)).

At a detention hearing, the government may present evidence by way of a proffer.  *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

## III.   <u>Argument</u>

As described in more detail below, the defendant's actions before, during, and after January 6, 2021, meet the low threshold of "serious risk" of obstruction of justice under Section 3142(f)(2)(B)—the lowest burden of proof, in fact, found in the Bail Reform Act.  Indeed, the defendant participated in arguably one of the largest obstruction efforts in the history of the United States.  A federal grand jury has found probable cause that the defendant violated 18 U.S.C. § 1512(c)(2) by obstructing, influencing, or impeding an official proceeding—here, the congressional proceedings to certify the 2020 United States Presidential Election.  What's more, he did not act alone, but is charged along with a large number of others with conspiring to commit that obstruction.  A defendant willing to take these extraordinary steps to obstruct the certification of a Presidential election surely poses a serious risk of obstructing justice or intimidating witnesses involved in his own criminal case—something he appears to have already done.  A preliminary

analysis of the defendant's devices shows that he appears to have surgically deleted a specific Signal thread he and his coconspirators used to communicate throughout their obstructive efforts.[2] James later instructed members of his team to do the same and to keep quiet, writing, "We need to make sure that all signal comms about the op has been deleted and burned."[3]

The defendant's obstructive conduct is so serious in nature that it not only clears the low bar to hold a detention hearing under 3142(f)(2)(B), but it also demonstrates why the factors in Section 3142(g) favor his detention.  Far from simply breaking into the Capitol building for a few minutes and walking out—itself a serious crime—the defendant coordinated with others, obstructed the official proceeding, and made efforts to cover his and others' tracks.

## A.  The Defendant's Coordination with Others Before January 6

The defendant engaged in extensive planning and coordination with his coconspirators and others to travel to Washington, D.C., and eventually disrupt Congress.  In *Munchel*, the D.C. Circuit addressed various factual considerations around the events of January 6th as they relate to pretrial detention.  One consideration the Court focused on was whether the defendant was "involved in planning or coordinating the activities."  *Munchel*, 2021 WL 1149196, at *8; *see also United States v. Worrell*, Case No. 21-MJ-296, ECF No. 13 (D.D.C. Mar. 19, 2021) (C.J. Howell) (concluding that a defendant presented a serious risk of danger to the community, in part because his participation in the mob was "planned, calculated and intentional" given that he was an "unapologetic member of the Proud Boys gang" and "assembled with a larger group of Proud

---

[2] To date, the FBI has conducted a preliminary analysis of the defendant's devices, which has involved manually reviewing all of the Signal chats on the phone and reviewing various folders of messages on the devices—the devices do not appear to contain the "DC OP Jan 6 21" Signal thread the defendant is known to have used before, during, and after the January 6 attack.  The forensic analysis of the phone is ongoing.

[3] Relatedly, the government is prepared to provide the Court with certain information discovered in the course of its investigation for *ex parte* and *in camera* review.

Boys" on his way to helping the mob storm the Capitol).  According to the D.C. Circuit, planning or coordinating with others is relevant in considering the context that made the events of January 6 possible and, ultimately, assessing whether a defendant was a threat that day or continues to present an ongoing threat of dangerousness.  *See id*.  Here, the defendant planned and coordinated with a large number of others in traveling to Washington, D.C., arranging for armed cohorts to stage themselves nearby, storming the Capitol, and acting in concert afterwards.  Such efforts demonstrate a continued dangerousness beyond just the circumstances of January 6, 2021.

The group's coordination crossed a variety of platforms – some public, like open letters and calls to action; some private or encrypted, like Go To Meeting and Signal.

### i.  *Person One's Open Call for Insurrection*

On December 14, 2020, Person One published on the Oath Keepers website a letter titled, "Open letter to President Trump: You Must Use Insurrection Act to 'Stop the Steal' and Defeat the Coup."[4]  Citing "well-orchestrated mass vote fraud" resulting in the "install[ation]" by "Communist Chinese and their domestic enemy allies" of "illegitimate puppet, Joe Biden," Person One implored President Trump to:

> [A]ct NOW as a wartime President, pursuant to your oath to defend the Constitution, which is very similar to the oath all of us veterans swore.  We are already in a fight.  It's better to wage it with you as Commander-in-Chief than to have you comply with a fraudulent election, leave office, and leave the White House in the hands of illegitimate usurpers and Chinese puppets.  Please don't do it.  Do NOT concede, and do NOT wait until January 20, 2021.  Strike now.

Person One further predicted: "If you fail to act while you are still in office, we will have to fight a bloody civil war and revolution against these two illegitimate Communist Chinese puppets, and their illegitimate regime."  Ultimately, Person One requested in this letter that President Trump

---

[4]*See* https://www.independentsentinel.com/oath-keepers-open-letter-to-president-trump-you-must-use-insurrection-act/ (Last accessed on April 8, 2021).

[i]ssue a Presidential Proclamation, directly invoking the Insurrection Act, declaring an insurrection, rebellion, and coup to be in effect by domestic enemies of the U.S. Constitution and traitors who are in collusion with and/or acting as agents of a foreign enemy (specifically Communist China, but also other known or unknown foreign enemies) and to call up the militia (including the National Guard, us veterans, and patriotic Americans of military age) and US military to suppress the insurrection. That proclamation should declare that domestic traitors have conspired with a foreign enemy, specifically Communist China, and have been either bribed or blackmailed by that enemy, and together they have subverted our electoral system from top to bottom to rig elections at every level, and to steal elections with the intent of overthrowing our Constitution and our way of life.

On December 23, 2020, Person One published on the Oath Keepers website a second letter titled, "Open letter to President Trump, Part II: Act now! Do NOT Wait for Jan 6."[5] Person One also argued, "You are running out of time" to invoke the Insurrection Act and to disregard those who are advising against taking action because "you are already in a war, and you must act as a wartime president, and there is not a minute to lose."

   ii.  *Go To Meetings with Person One, Coconspirators, and Others*

One day later, on December 24, 2020, the defendant joined a Go To Meeting,[6] entitled "OK Intel Call," with Person One, Codefendant Kelly Meggs, and others. In fact, between November 19 and December 31, 2021, the defendant attended approximately six meetings on Go To Meeting that were affiliated with the Oath Keepers and included a number of other indicted and uncharged individuals who were present in Washington, D.C. on January 6, including Kelly Meggs, Kenneth Harrelson, Jessica Watkins, Person One, and others. The defendant used his real name in the earlier meetings after a rally in Washington, D.C. in November 2021, but began to use his phone

---

[5] *See* https://oathkeepers.org/2020/12/open-letter-to-president-trump-part-ii-act-now-do-not-wait-for-jan-6/ (Last accessed on April 8, 2021).

[6] Go To Meeting is an online meeting site that allows users to host conference calls and video conferences via the Internet in real time.

number or anonymized monikers as the meetings got closer to January 6, 2021.  The names of the meetings included "se leaders dc 1/6/21 op call," "ok intel call," and "ok alabama meeting":

| session_subject | session_type | session_date | session_duration | participant_name | participant_type |
|---|---|---|---|---|---|
| ok national call - post dc | scheduled | 2020-11-19 | 134.18 | josh james alabama | attendee |
| ok national call - post dc | scheduled | 2020-11-19 | 134.18 | joshua james- alabama | attendee |
| ok florida | recurring | 2020-12-08 | 75.28 | +17707124304 | attendee |
| ok alabama meeting | recurring | 2020-12-18 | 99.43 | hydro - al | attendee |
| ok alabama meeting | recurring | 2020-12-18 | 99.43 | +17707124304 | attendee |
| monday night call | scheduled | 2020-12-22 | 103.27 | hydro - al | attendee |
| ok intel call | recurring | 2020-12-24 | 136.33 | hydro - al | attendee |
| ok intel call | recurring | 2020-12-24 | 136.33 | hydro - al | attendee |
| se leaders dc 1/6/21 op call | scheduled | 2020-12-31 | 11.05 | hydro - al | attendee |

     *iii.  Signal Chats*[7]

     The defendant, his coconspirators, and a number of others also utilized an end-to-end encrypted messaging platform known as Signal to coordinate.  On December 30, 2020, the defendant joined a Signal thread (as "HYDRO AL State POC") titled "DC OP Jan 6 21" with Person One, Codefendants Kelly Meggs, Kenneth Harrelson, Jessica Watkins, Roberto Minuta, and a number of other individuals.  In that thread, some individuals discussed potentially engaging in violence themselves and relying on a "QRF" (Quick Reaction Force) that would be armed and staged nearby for quick access to Washington, D.C.  Rather than leave the thread and abort the mission at the early signs of potential violence, the defendant continued to engage with the group, and in fact branched off to individual side conversations with some of the more vocally violent coconspirators and others about the armed QRF.  *See Munchel*, 2021 WL 1149196, at *8 (noting that district courts should consider whether a defendant was engaged in violence or planning and coordinating such activities with others).

---

[7] In addition to Signal, a preliminary analysis of the defendant's devices shows that he used a number of encrypted messaging platforms to communicate about Oath Keepers and the operation on January 6, 2021, including Rocket.chat and ProtonMail.

On December 26, 2020, for example, the defendant reached out to Codefendant Kelly Meggs (using call sign "OK Gator 1") to discuss weapons and coordination for January 6. "Brother, whats you opinion on a CC for DC?  Its my opinion, that guys that have never been, need to be brought up to speed on the dogs and don'ts."  Meggs responded, "No CC we are running a QRF outside of town."   The defendant then volunteered to coordinate three states' worth of individuals for the January 6 operation: "I think its very important that we are all as States go, connected and well established on who is doing what . . . If you have time, I'd like to establish a connection with the Florida team to connect MS, GA, and AL."

On December 31, 2020, another individual reached out to the defendant in a side Signal thread to offer help for the upcoming January 6 operation in Washington, D.C.: "I have friends not far from DC with a lot of weapons and ammo if you get un trouble i ca. Coordinate help."  The defendant responded, "That might be helpful, but we have a shitload of QRF on standby with an arsenal."

On January 1, 2021, Codefendant Kelly Meggs wrote to the "DC OP Jan 6 21" group that they may already be in an "actual ware" with "domestic" enemies:

| OK Gator 1 | 1/1/2021 | 1:19 AM | Yep, Weird times my friends weird times. We  truly may be in the actual ware they have said we are in. Cyber attacs, bombs in TN, the place where they printed the mail in ballots burned to the group. It's a full fledged assault on our republic. Funny we are supposed to be ready for enemies foreign or domestic.<br><br>This is foreign AND domestic. I hope Trump handles this. He has the power, does he have the testicular fortitude?! I say he does! so we wait. |
| --- | --- | --- | --- |

The same day, the defendant reached out to one of the operational leaders in a side Signal thread and asked, "Do we have a farm location for weapons?"  That operational leader responded, "Not that I am aware of yet.  If nothing else, my hotel is in VA and has secured underground parking.  About 15-20 minutes outside DC, less if you really don't care about speed limits… would be great if we had someone with an enclosed truck type vehicle and had a quick response unit just outside the city."  "I agree," the defendant replied.

On January 2, Codefendant Kelly Meggs reported to the "DC OP Jan 6 21" group that he would be coordinating with the "QRF" with the Oath Keepers from North Carolina:

| OK Gator 1 | 1/2/2021 | 6:28 AM | Good call last night. Lots focered, I'll get with NC team today and find out QRF location |
|---|---|---|---|

The same day, another individual reached out to the defendant in a side Signal thread and asked, "Is it established who we are leaving our weapons with before we get into DC?"  On January 3, the defendant was aware of the weapons plan and responded, "Yes I believe so.  Are you bringing?"  The other individual confirmed: "I have my rifle and side arm."

### iv.  Leadership Role

The Signal chats also demonstrate that the defendant was designated as a leader in the group, and that he operated as one early on.  Specifically, on December 30, 2020, another individual was scheduling a call on the "DC OP Jan 6 21" group to discuss the agenda for January 5 and 6.  The defendant, however, commented that the members of the call should be restricted to "leaders," presumably for operational security: "In my opinion sir, let's keep this leadership only..we only need 5-10 on a call, not 50."  The next day, on December 31, 2020, the defendant reported to the same operations leaders in the group that the defendant's team would be traveling to Washington, D.C. on January 5, 2021.  "Great, Josh," the operational lead responded.

On January 1, 2021, that same operational lead reached out to the defendant in a side Signal thread and asked him to take on a larger leadership role over more than just his team from Alabama: "Hydro, know you have your team.  But would you be interested in being the coordinator for the security teams, outside of the PSD, and coordinating with [Person Ten]?  Thinking that you might be able to use the folks that [Person Ten] doesn't need for close details and divide into teams at the venues and if we have enough maybe some mobile folks patrolling in between?  I know you have the experience and knowledge to make it work!"  On January 3, 2021, that operational lead confirmed to everyone in the "DC OP Jan 6 21" group that the defendant would be the "second" in command of all the protective security details operating in Washington D.C. on January 5 and 6.

Some of the defendant's subordinates under his leadership were also in the "DC OP Jan 6 21" group.  One in particular, who said he was part of the defendant's unit, discussed being prepared to use violence.  On December 31, 2020, soon after Codefendant Jessica Watkins joined the Signal thread, the individual stated, "The more patriots the merrier going to be wild."  That same day, he discussed bringing ammunition and potentially a firearm into Washington, D.C.:

| | 12/31/2020 | 4:18 PM | Someone can tell me if I'm crazy but I'm planning on having a backpack for regular use and then a separate backpack with my ammo load out with some basics that I can juyst switch too is shit truly the fan blades... |
| | 12/31/2020 | 4:18 PM | If shit .... |
| | 12/31/2020 | 16;20 | I will be  the guy running around with the "budget AR" [emoji] |

Rather than leave the thread or correct his subordinate's violent plans, the defendant continued to engage with the group building up to January 6.

### B.  The Defendant's Obstructive Actions on January 6

On January 4, 2021, Person One posted a public call to action on the Oath Keepers website, in part describing what the defendant and his coconspirators would be doing in Washington, D.C., in an effort to support the President in stopping the certification of the Presidential Election: They would be forming "PSD teams" to, in part, "be out on the streets to help keep Trump supporters safe in general as they walk back to and from their hotels, vehicles, or Metro stops (that's when Antifa likes to attack the weak, old, disabled, or families – like the hyenas they are)."  As Person One explained it, it was "CRITICAL that all patriots who can be in DC get to DC to stand tall in support of President Trump's fight to defeat the enemies foreign and domestic who are attempting a coup, through the massive vote fraud and related attacks on our Republic."

On January 5 and 6, 2021, the defendant, some coconspirators, and others traveled into Washington, D.C., and provided what appears to be a protective security detail for a certain high-profile subject.  Eventually, at 1:25 p.m. on January 6, Person One noted in the Signal chat to the defendant and some of the coconspirators, "Pence is doing nothing.  As I predicted."  At 1:38p.m., Person One added: "All I see Trump doing is complaining.  I see no intent by him to do anything. So the patriots are taking it into their own hands.  They've had enough."  At 2:14 p.m., Person Ten stated, "The have taken ground at the capital[.]  We need to regroup any members who are not on mission."  Person One then reposted that message and instructed the group: "Come to South Side of Capitol on steps" and then sent a photograph showing the southeast side of the Capitol.  At 2:41 p.m., Person One posted another photograph showing the southeast side of the Capitol with the caption, "South side of US Capitol.  Patriots pounding on doors[.]"  At about that time, Codefendant Kelly Meggs and several of others were breaching the Capitol.

Nearly around the same time, at about 2:30 p.m., the defendant, Codefendant Minuta, and others loaded into golf carts and began speeding toward the Capitol building to also break into the Capitol building.  In a video capturing their street race to the Capitol, Minuta is seen swerving around law enforcement vehicles attempting to throw blockades on multiple streets.  While doing so, Minuta says, "Patriots are storming the Capitol building; there's violence against patriots by the D.C. Police; so we're en route in a grand theft auto golf cart to the Capitol building right now . . . it's going down, guys; it's literally going down right now Patriots storming the Capitol building . . . fucking war in the streets right now . . . word is they got in the building . . .let's go."  While Minuta speeds toward the Capitol, the defendant does not bail from the golf cart, but rather punches the Capitol building address into his phone and audibly directs Minuta, aiding them in their endeavor to storm the Capitol building.  The defendant, Minuta, and others can be seen in two golf carts circled in red in the below surveillance screenshot in Washington, D.C., as they speed to the Capitol building:



When the defendant arrived at the Capitol building with Minuta and others, Minuta began to aggressively berate law enforcement officers attempting to protect the perimeter of the Capitol. Rather than abandon Minuta for those actions, the defendant joined him in storming the Capitol. At about 3:15 p.m., the defendant, Minuta, and others who had congregated with them throughout the day stormed inside the same east-side Rotunda entrance as their other codefendants had a little over half an hour earlier.  In doing so, they pushed past law enforcement officers guarding the Capitol building entrance who placed their hands on the defendant's and Minuta's chests in an apparent effort to stop them from entering, as depicted in a screenshot in the red circle below:



Finally, after exiting the Capitol building, the defendant joined a meeting approximately 100 feet away from the Capitol that included Person One, multiple codefendants, and a number of other members of the "stack" formation that some co-defendants joined as they stormed the Capitol. Also in the meeting were multiple individuals that had traveled around with the defendant in Washington, D.C., and stormed the Capitol at or around the same time the defendant and Minuta did. These individuals are detailed below in a screenshot capturing this after-action gathering:



### C.  The Defendant's Obstructive Efforts After January 6

In the days after January 6, the defendant continued to communicate with his coconspirators and others about their actions that day.

After expressing to the others that they had lost after Trump conceded, the defendant took steps to conceal evidence or keep potential witnesses quiet. A preliminary analysis of the defendant's devices revealed that the "DC OP Jan 6 21" Signal thread did not appear to be anywhere on the devices. Among approximately 70 different Signal threads, the defendant appears to have excised the one that he, a number of other coconspirators, and others used to communicate before, during, and after the attack on the Capitol. One Signal communication from January 8 the

defendant did leave on a device sheds light on why the "DC OP Jan 6 21" thread may be missing: "We need to make sure that all signal comms about the op has been deleted and burned," the defendant told another individual from the DC OP group.  That individual responded, "Does leaving the group delete them?"  And the defendant replied by teaching him how to delete evidence: "No.  Just press and hold to get trash bin icon and delete messages.. just taking all necessary precautions is all."  One minute later, the individual informed the defendant that he had complied, stating, "Above: done."

Additionally, in the days following January 6, there are a number of private Signal threads between the defendant and various other previous members of the "DC OP Jan 6 21" thread, in which the data on the device depicts multiple messages that the users deleted.  Finally, with regard to the defendant's own deletion, a preliminary analysis on his device demonstrates that a number of photographs all taken on January 6, 2021, were deleted.

And his obstructive efforts do not appear to have been limited to just himself.  On January 10, 2021, the defendant apparently used his leadership position to silence potential witnesses.  In a private Signal thread with Co-defendant Kelly Meggs, the defendant explained, "I'm not trusting Signal right now.  All my guys have been instructed to keep quiet until further notice."

## IV. <u>Conclusion</u>

In light of the defendant's own apparent deletion on his devices and his instructions to potential witnesses to engage in the same obstruction, the government submits that the defendant presents a serious risk of obstruction of justice, warranting a detention hearing in this case under Section 3142(f)(2)(B).

Further, the nature and circumstances of the offense, the weight of the evidence, and the particular danger the defendant would pose to the community if released all make clear that pretrial

detention is warranted.  In the days leading up to January 6, 2021, the defendant reached out to a number of individuals about potentially bringing firearms to the operation or coordinating with a "shitload of QRF with an arsenal" that he understood would stand at the ready outside Washington, D.C.  When an operational leader suggested some of those firearms should be staged at a nearby hotel in an enclosed truck for speedy access, the defendant agreed.  None of these premediated, dangerous operational plans scared the defendant away from the conspiracy.  Quite the opposite: the defendant leaned into a leadership role, stormed the Capitol with others, and instructed some of his subordinates to "burn" messages and  "keep quiet."  As made clear in the above photographs, there continue to be uncharged coconspirators and witnesses to this case—all potentially subject to the defendant's obstructive efforts if he is released.

In the Circuit's view, "those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way."  *Munchel*, 2021 WL 1149196, at *8.  The defendant's conduct reflects the Circuit's articulated category of dangerousness that weighs in favor of pretrial detention, and the order detaining the defendant pending trial should stand.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:  _____
Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar 5453741
Ahmed M. Baset
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530


*/s/ Alexandra Hughes*
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004